UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **LEAR SIEGLER SERVICES** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **VS.** | ) | **Civil Action No.  SA-05-CA-679-XR** |
| | ) | |
| **ENSIL INTERNATIONAL CORP.** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

## ORDER

Plaintiff filed two partial motions for summary judgment (Docket Nos. 32 and 34), covering 33 of the 95 repairs at dispute in this case. Defendant filed a response opposing Plaintiff's motions, and filed its own motion for summary judgment (Docket No. 35), which covers all of Plaintiff's claims. After reviewing the parties' briefings and attached exhibits, along with the relevant case law, the Court GRANTS Plaintiff's motions and GRANTS in part and DENIES in part Defendant's motion. The Court strongly urges the parties to consider non-binding mediation as the next step in their ongoing efforts to resolve their disputes.

## Factual and Procedural Background

Lear Siegler Services is a government contractor headquartered in San Antonio, Texas.  Lear obtains spare parts and facilitates repairs of military equipment for foreign countries. After receiving the repair requests, Lear posts them on a secured-access web site, where pre-approved vendors can place bids for repair contracts.

One of these pre-approved vendors was Ensil International Corporation, a New York based company specializing in manufacturing, repairing, designing, and testing electronic circuit boards

and related assemblies. Beginning around March 2002, Ensil bid on and was awarded by Lear contracts for the repair of avionics and electronics equipment under the PROS-II contract system.

PROS-II is the acronym for the federal government's Parts and Repairs Ordering System. The PROS-II program allows foreign militaries to obtain spare parts and repairs from private United States repair facilities. Lear is a contractor who administered the PROS II program on behalf of the United States Government.

All 95 of the repair order contracts at issue in this lawsuit were issued by Lear to Ensil under the PROS-II program. Under this program, once a subcontractor like Ensil makes a repair, the corrected product is forwarded to the foreign military end user. If the equipment is determined by the end user not to have been satisfactorily repaired, a Supply Discrepancy Report (SDR) is generated and submitted to the United States Air Force, who forwards it on to Lear. After receiving the SDR, Lear notifies the subcontractor, in this case Ensil.

All of the items in dispute in this case were purportedly repaired by Ensil and sent to the foreign government end users, who reported defects with the products they received. These products were then sent back to Ensil for inspection, a determination of whether they were still under Ensil's warranty, and as necessary, repair.

Lear claims that despite Ensil's contract and warranty obligations, Ensil failed to inspect the 95 products and make the necessary repairs. Accordingly, on May 20, 2005, Lear sent a letter to Ensil demanding return of the money paid to it by Lear for the product repairs, along with all the unrepaired equipment remaining in Ensil's possession.  On June 7, 2005, having received neither the unrepaired equipment nor a reimbursement of the payment previously tendered, Lear filed suit against Ensil in Texas state court, which Ensil thereafter removed to this Court. In July 2006, Ensil

-2-

returned the purportedly defective parts, unaccompanied by any repair or inspection reports evidencing that the warranty inspections had been conducted.

**Analysis**

Summary Judgment Standard

The Federal Rules provide that summary judgment "shall be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."[1] The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[2] Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings, but must present evidence setting forth "specific facts showing a genuine issue for trial."[3]

Summary judgment is mandated if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case on which that party will bear the burden of proof at trial."[4] In such a situation, there can be "'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case

---

[1] FED. R. CIV. P. 56(c).

[2] Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

[3] FED. R. CIV. P. 56(e)(2).

[4] *Celotex Corp.*, 477 U.S. at 322.

necessarily renders all other facts immaterial."[5]

Overview of Claims

In its First Amended Complaint, Plaintiff alleges breach of contract and breach of warranty claims against Defendant, in addition to claims for fraud and fraudulent inducement. In response, Defendant asserts that none of the requested repairs cited by Plaintiff were covered by Defendant's warranties, and furthermore, Plaintiff has presented no evidence showing that Defendant failed to properly repair any of the items in question. Thus, Defendant argues no breach of contract or warranties occurred. As for the claims of fraud and fraudulent inducement, Defendant's position is that other than a misunderstanding as to where the repairs would take place, Plaintiff can show no evidence rising to the level of fraud, nor evince how it was injured by whatever misunderstanding existed between them.

Length of Warranty

As a starting point, the parties do not dispute that they entered into 95 separate, valid contracts, covering the 95 repairs at dispute in this controversy. The parties also do not dispute that the requirements imposed on Defendant by these contracts are essentially the same for each one. They do dispute, however, the length of time covered by Defendant's warranties. Plaintiff asserts Defendant agreed to warranty its repair work for one-year, while Defendant counters the relevant coverage period was only six months.

More specifically, while Defendant acknowledges that the coverage period for spare parts was one-year, it contends the period for repairs only extended for "six months after acceptance of

---

[5] *Id*. at 322-3.

the repaired article."[6] Because Defendant maintains it was notified of the alleged defects in the repaired items at issue more than six months after the end users' freight forwarder had received them, it argues the warranty periods expired before Defendant was notified of any of the alleged defects.

With each repair, Plaintiff provided Defendant with a form to fill out in order to submit its bid. Defendant submitted individual repair and warranty quotes for each of the 95 items at issue in this case. The bid form provided two options for warranties - six months or twelve months, with a space next to each for the bidder to indicate which one it was offering. On each of Defendant's repair quotes, it clearly checked off that it was providing a warranty for "12 months after acceptance."[7] Plaintiff relied on Defendant's twelve month warranty commitment in selecting Defendant over other bidders.[8]

Defendant's other actions pre-litigation further support Plaintiff's interpretation of the length of time for Defendant's express warranties. For example, with respect to the nine repair items covered in Plaintiff's first motion for partial summary judgment, Plaintiff notified Defendant of the alleged defects in Defendant's repair work within six to eleven months from the date on which the items were accepted by the end user. In other words, Defendant was notified **after** the six month warranty it argues was in place, but before the twelve month warranty Plaintiff contends governed their contracts. For two of these items, Plaintiff appears to inadvertently have failed to immediately notify Defendant of the rejection of its work by the end users. In response, Defendant, through one

---

[6] Docket No. 36 at 2; Docket No. 31 at Exhibit D.

[7] Docket No. 31 at Exhibit F.

[8] Docket No. 37 at Exhibit A.

of its employees, replied, "I don't think that I was notified of these SDRs, but I think that we are still in the '**one year**' time frame."[9]

All nine items were returned to Defendant, who allegedly performed additional repairs without ever intimating to Plaintiff that any of the items were no longer covered by warranty. After purportedly making the repairs, Defendant shipped the items back to the respective end users.[10]

As convincing as they are, however, these pre-litigation actions are unnecessary for the Court to reach a conclusion on the applicable length of the warranties. Plaintiff had a standard set of PROS-II Terms and Conditions (Terms) that were in place from 2001 through 2005 and that required either a six or twelve month warranty. Defendant received a copy of these Terms at the beginning of its business relationship with Plaintiff. Those Terms expressly state that "warranties . . . shall not be deemed to be exclusive."[11] In its bids, which were relied upon by Plaintiff, Defendant promised twelve month warranties on all its work. Because these enhanced warranty commitments were incorporated into the contractual agreements between the parties through the non-exclusivity provision of the Terms, it is clear that the parties agreed to a one-year warranty for all repairs.

Requirements of Warranty

Having determined the length of the warranty, the next inquiry concerns what the warranty

---

[9] Docket No. 31 at Exhibit J (emphasis added).

[10] Indeed, it appears that before this litigation commenced, Defendants never raised the argument that the relevant warranty period for repairs was six months rather than twelve. As Plaintiff points out, on 53 prior repair requests, Defendant honored the warranty without protest, despite the fact that for most of these items, Defendant was notified of the need for warranty evaluation and repair between five and twelve months after the item's initial acceptance by the end user. Docket No. 34 at 6-7; Exhibit F at 152:8-12, 153:10-13; and Docket No. 33 - Exhibit A at ¶ 15-6.

[11] Docket No. 31 at Exhibit D.

required Defendant to do. At a minimum, Defendant had to abide by the express language in the Terms, which, amongst other things, stated that the "seller [Defendant] must take positive corrective action to prevent continued shipment of material identified as nonconforming by Lear . . . Seller shall determine the root cause of the problem and shall make necessary changes and make such documentation available for review by Lear."[12] Defendant was also obligated to "provide for maintenance of documented evidence of the inspection and test results. Such evidence shall be available for review by Lear Siegler Services, Inc., or the Government."[13]

In other words, when items were returned for allegedly defective repairs, Defendant had a duty to inspect the items, evaluate whether or not they were defective, and then determine whether they were covered by warranty. Defendant does not seem to dispute that the warranties required at least as much.

<u>The Evidence Concerning Defendant's Fulfillment of Warranty Obligations</u>

What is so troubling about this case is the complete lack of evidence showing that Defendant so much as even inspected the disputed items returned to it for repair. At the summary judgment stage,  the nonmoving party may not rest upon mere allegations or denials in the pleadings, but must present evidence setting forth "specific facts showing a genuine issue for trial."[14] Despite this requirement, Defendant has failed to produce even a shred of credible evidence evincing it so much as inspected the returned items, much less made determinations about whether there were defects, what the cause of those defects were, and whether the defective products remained covered by

---

[12] *Id.* Exhibit D at B-18(c).

[13] *Id.* Exhibit D at B-18(a)(2).

[14] Fed. R. Civ. P. 56(e)(2).

warranty. All Defendant provides is a series of affidavits from Farsad Kiani, president of Ensil, alleging he repaired or supervised the repairs of all the items in dispute in this litigation.[15] According to him, the 33 items described in Plaintiff's two partial summary judgment motions displayed defects that were not caused by anything his company did in the course of their repair work. He then includes brief descriptions of the problems with each item, such as "physical damage" or "parts missing, tampered with including serial number plate is missing."[16]

Such testimony, which fails to identify even the most prosaic information about the inspections or diagnostic tests upon which it is based, is merely conclusory and insufficient at this stage of litigation to give rise to a genuine issue of material fact. Indeed, when asked to produce "all documents that you reviewed that concern any of the SDRs at issue in this lawsuit," Mr. Kiani's response was "no such documents have been maintained."[17]

The Court finds incredulous the position that a sophisticated company such as Ensil could perform inspections and diagnostic testing on specialized pieces of technologically advanced military hardware, analyze whether the equipment properly functioned, and if not, determine the source of the problem(s), without so much as generating a single document or report detailing the work performed (other than the unsupported conclusory ones attached to Mr. Kiani's affidavits). As Plaintiff phrased it, it is highly questionable how Defendant could fail "to provide even a rudimentary diagnostic report that one would expect from an automobile mechanic, much less the type of detailed reports that one would expect from a facility that has been paid millions of dollars

---

[15] Docket No. 36 at Exhibits B, C, and D.

[16] *Id*. Exhibit B at Exhibit A.

[17] Docket No. 38 at Exhibit A.

to repair several specialized pieces of electronic military equipment."[18]

In sum, Defendant possessed a contractual obligation to inspect and determine whether repaired parts returned to it were defective, and if so, whether these defects resulted from causes covered by the warranty agreement between Plaintiff and Defendant. Because there is no evidence Defendant properly performed these contractual obligations, the Court finds Defendant breached its contracts with respect to the 33 items addressed in Plaintiff's two motions for partial summary judgment.

Plaintiff's Pleadings

Finally, in a clever attempt to escape liability, Defendant argues Plaintiff did not plead a cause of action for failure to repair items once they were reported to be defective, but instead, for failure to properly repair defective items. In other words, the focus, Defendant contends, should be on whether there were any defects, not on what Defendant did when confronted with allegations of defects. Because Defendant argues there is no evidence establishing the items were actually defective, or if defective, that the defects were attributable to Defendant, summary judgment should be granted in its favor.

The problem with Defendant's argument is that under the warranty agreements, it was Defendant's job, not Plaintiff's, to inspect any returned items to determine whether the defects alleged by the end users existed, and if so, what their causes were and whether they were covered by warranty. Plaintiff admittedly does not have the capacity to perform such inspections and testing, hence the reason it hired Defendant. Now, for Defendant to assert Plaintiff has no evidence, other than the end user reports identifying the repaired products as defective, to show that Defendant's

---

[18] Docket No. 37 at 4-5.

initial repairs were inadequate or improper is to say nothing more than Plaintiff does not have the evidence Defendant demands of it because Defendant breached its contract. The very evidence Defendant calls for from Plaintiff is the exact evidence it should have given to Plaintiff, but did not. Instead, when faced with accusations from multiple end users, including the governments of Taiwan, South Korea, Israel, and Saudi Arabia,[19] that its repair work on 95 individual parts was defective, Defendant failed to undertake any investigation, as required under its warranty, to determine whether these accusations were meritorious or not. Thus, to buy Defendant's argument would be to ignore the presented facts of the case and reward Defendant for breaching its contractual obligations.

It is true that as of the last submissions of the parties, the United States Government had not completed its final investigation into whether the products were defective, and if so, who or what is to blame. This fact does not change, however, the reality that Plaintiff paid Defendant to comply with the terms of their contractual relationship, which Defendant failed to do by not performing a proper warranty inspection, analysis, and as necessary, repair work. Because Defendant failed to comply with its warranty obligations, repairs were neither identified nor made, and Defendant was obligated to turn to other companies to attempt to cover for Defendant's breach.

Accordingly, Plaintiff's motions for partial summary judgment are granted as to the contract and warranty breach claims for the 33 repair items covered in those two motions.

Fraud and Fraudulent Inducement

Plaintiff also avers that Defendant made fraudulent misrepresentations regarding its repair capabilities. Plaintiff asserts that Defendant made these misrepresentations knowingly and with the intent to defraud and deceive Plaintiff into entering into contracts and making payments to Defendant

---

[19] Docket No. 26 at 4.

for services Defendant knew it could not perform.

The only evidence of a misrepresentation that Plaintiff has presented concerns the location of the repair facility used by Defendant to allegedly make the repairs contracted for by the parties. According to Plaintiff, Defendant represented that the repairs would take place in New York, but in actuality, they took place in Canada.

While Defendant should have been forthcoming about where the repairs would take place, Plaintiff has presented no evidence showing either that Defendant lacked the facilities to properly conduct the repairs or that it was injured by Defendant's decision to conduct the repairs in Canada.

Therefore, Defendant's summary judgment motion is granted as to Plaintiff's fraud and fraudulent inducement claims.

Damages

Regarding damages, the parties should be prepared to address this issue before the jury at trial.

Mediation

In their Joint Alternative Dispute Resolution Report, both parties indicated that "non-binding mediation would be appropriate in this case."[20] Accordingly, the Court strongly urges the parties to consider mediation to see if they can resolve their differences without resort to further litigation. Should the parties wish, the Court is willing to assist in the selection of a mediator.

## Conclusion

For the reasons set forth above, Plaintiff's partial motions for summary judgment (Docket Nos. 32 and 34) are GRANTED, and Defendant's motion for summary judgment (Docket No. 35)

---

[20] Docket No. 27 at 1.

is GRANTED in part and DENIED in part. The Court strongly urges the parties to consider non-binding mediation as the next step in their ongoing effort to resolve their disputes.

It is so ORDERED.

SIGNED this 17th day of December, 2007.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE